**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

KIMBERLY SUE RUST,                )
           Plaintiff,                )
                       )
v.                                )          CAUSE NO.: 2:12-CV-325-PRC
                       )
CAROLYN W. COLVIN, Commissioner   )
of the Social Security Administration,  )
           Defendant.            )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Kimberly S. Rust on August 13, 2012, and Plaintiff's Brief in Support of Complaint [DE13], filed December 6, 2012. Plaintiff requests that the Court reverse the Administrative Law Judge's decision of March 24, 2011, denying her child insurance benefits and supplemental security income, and remand for further administrative proceedings. For the reasons set forth below, Ms. Rust's request is denied, and the Court affirms the decision of the Administrative Law Judge.

## PROCEDURAL BACKGROUND

Plaintiff Kimberly Rust filed applications for Supplemental Security Income Benefits ("SSI") and Disability Insurance Benefits under Child Disability ("CIB"), on September 2, 2009.[1] Both applications were denied initially on December 22, 2009, and on reconsideration on March 3, 2010. Ms. Rust was granted her request for a hearing before an Administrative Law Judge ("ALJ"), which took place via video conference on February 10, 2011, with ALJ Roxanne Kelsey. Ms. Rust was

---

[1] The regulations governing the determination of disability for CIB are found at 20 C.F.R. § 404.1501 *et seq.* The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.* For convenience, only the CIB regulations are cited in this Opinion.

represented by her attorney. Ms. Rust, her mother, and a vocational expert ("VE") testified at the

hearing. The ALJ made the following findings:

1. Born [in 1986], the claimant had not attained age 22 as of January 1, 2002, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since January 1, 2002, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: a back condition with ongoing pain and radiculopathy following surgical excision of lymphomas;[2] impairments impacting her left knee, including degenerative disease; headaches; obesity; alcohol use; and anxiety/depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no more than occasional pushing or pulling with her left lower extremity. She can occasionally climb ladders, ropes or scaffolds, kneel, crouch, or crawl. She should have no more than occasional contact with supervisors, coworkers and the public. The claimant would need a sit and stand option but would be able to remain on task.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in 1986] and was 23 years old, which is defined as a younger individual age 18-49, on the application date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

---

[2] The record shows that Ms. Rust suffers from lipomas, not lymphomas.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2002, through the date of the decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(AR 21-31).

The ALJ issued her decision on March 24, 2011, and the Appeals Council declined review on May 2, 2012, establishing the ALJ's decision as the final determination of the Commissioner of Social Security ("Commissioner"). Following denial of review, Ms. Rust was referred to new counsel and, after the Appeals Counsel granted Ms. Rust's request for an extension of time, Ms. Rust timely filed her Complaint.

## FACTUAL BACKGROUND

### A. Background

Plaintiff Kimberly Rust was born in 1986. Ms. Rust was 23 years old at the time she filed her applications and 25 years old at the time the ALJ issued her decision. Ms. Rust worked as a cashier and waitress, but she has not worked since 2006 and never earned much more than $2,000 in one year. The VE and the ALJ each concluded that Ms. Rust has no past relevant work. At the time of the hearing, Ms. Rust lived with her sister. Ms. Rust cares for her three young children.

### B. Medical History

Ms. Rust has a medical history of back and knee issues, mental health issues, and migraine headaches, each of which are discussed in turn.

*1.      Back and Knee Issues*

Ms. Rust first reported back problems to her family physician, Deepak Bhojraj, M.D., on April 20, 2001, describing low back pain and a lump on her back. From 2001 through 2007, Ms. Rust underwent five surgeries to excise recurring lipomas on her lower back. Ms. Rust complained about back pain intermittently to her doctors from 2001 to 2008. Ms. Rust first reported knee problems to Dr. Bhojraj on December 6, 2002, stating that she had woken a few days earlier with numbness in her left leg.

On January 7, 2003, an MRI of Ms. Rust's back was negative for any injury. On January 20, 2003, Dr. Abu-Aita performed a series of nerve tests on Ms. Rust's legs and found that the left leg had similar nerve function to the right leg. On January 21, 2003, an MRI of Ms. Rust's left leg was negative for any observable trauma or injury.

On January 29, 2003, Ms. Rust underwent a consultative examination by Daksha Vyas, M.D., a neurologist, who found normal gait and muscle system but also diagnosed low back pain with L5 radicular pain.[3] On May 29, 2003, Ms. Rust's mother reported to Dr. Bhojraj that the leg numbness was gone. On July 18, 2003, Ms. Rust reported back pain as well as pain and cramps in her left leg. On July 24, 2003, Dr. Koh performed an EMG and found normal responses in both legs and normal insertional activities; the test did not show any denervational activities.

Ms. Rust reported back pain to Dr. Bhojraj on June 10, 2004, and he prescribed Tylenol #3. Two masses were found in her lower back on July 29, 2004, but surgery could not be performed because she was pregnant. Ms. Rust complained in April 2005 that she pulled a muscle in her back while playing football, and Dr. Bhojraj prescribed muscle relaxers. Ms. Rust complained of

---

[3] The Court notes that Dr. Vyas' treatment notes are unreadable in a number of places, either through poor reproduction, or the inscrutability of the handwriting. Ms. Rust's attorney noted this difficulty at the hearing.

continuing low back pain on July 15 and September 13, 2005, and requested more muscle relaxers. On December 9, 2005, Ms. Rust reported to Dr. Bhojraj that she experienced cramping in her left knee, and he prescribed her Neoprofen and a knee brace.

On April 7, 2006, a new MRI was taken to compare to the MRI of her left leg taken on January 21, 2003; the MRI revealed degenerative intrasubstance abnormality. An arthroscopic evaluation of the meniscus was recommended to rule out a subtle tear.

On May 16, 2006, Ms. Rust's mother reported that Ms. Rust did not have time for physical therapy because she was busy taking care of her baby. On June 8, 2006, Ms. Rust complained of low back pain, and she was referred to Dr. Andrews for knee pain. Later reports from Ms. Rust suggest she underwent arthroscopy in June 2006, performed by Dr. Andrews; however, there is no direct evidence in the record of this procedure. On November 15, 2006, Dr. Vyas reported that Ms. Rust could not tandem walk (heel-to-toe), stand on her heels, or stand on her toes on the left side.

On January 15, 2007, Plaintiff reported to Dr. Bhojraj that she had surgery on her left knee cap in June 2006, but that she is in constant pain at a level of 10 out of 10 on a pain scale on a daily basis; Dr. Bhojraj prescribed Percocet for the pain. On March 5, 2007, Dr. Bhojraj prescribed Vicodin because Percocet made her feel nauseous.

On March 6, 2007, Dr. Lee performed a consultative examination of Ms. Rust's left knee. He noted some tenderness in her knee-cap, that her quadriceps were very weak, 3 out of 5, with very tight hamstrings, that she had full range of motion in her hips, and that her left knee could bend from 0 to 105 degrees. He indicated that Ms. Rust was not a candidate for surgery.

After surgery to remove a lipoma from her back on March 24, 2007, Ms. Rust complained of back pain to Dr. Bhojraj on April 5, July 10, and October 4, 2007. On April 11, 2007, Ms. Rust

continued to complain of low back pain and knee pain following her arthroscopic procedure. On August 30, 2007, Ms. Rust reported that her left knee pain had returned approximately one month earlier. On October 4, 2007, Ms. Rust reported low back pain and knee pain.

On January 29, 2008, Ms. Rust reported to Dr. Vyas that she had been taking three Vicodin per day instead of two for back pain. On January 29, 2008, Ms. Rust underwent an EMG test with Dr. Vyas, who concluded that the findings were suggestive of L5-S1 radiculopathy in the lower left extremity. On February 22, 2008, Ms. Rust reported that her left knee was painful to touch, but Dr. Bhojraj observed no abnormalities. On February 22, 2008, and March 25, 2008, Ms. Rust reported fatty tumors recurring in her back. On April 14, 2008, she told Dr. Vyas that her left knee pain was worsening. She complained of low back and knee pain to Dr. Vyas on May 7 and August 6, 2008. On October 24, 2008, Ms. Rust reported left knee pain to Dr. Vyas. On January 16, April 10, July 8, and September 30, 2009, Ms. Rust complained of knee pain to Dr. Vyas; she could not tandem walk, walk on heels, or walk on toes, at any of these sessions.

During a consultative examination with Teofilo Bautista, M.D., on December 13, 2009, Ms. Rust reported having knee surgery in 2006, which had caused her to experience continuous pain at a level of 10 out of 10 on a pain scale and that Vicodin reduced that pain to 4 out of 10 for two hours only.

On January 8, 2010, Ms. Rust complained to Dr. Vyas of a sharp and aching increase in knee pain and reported taking extra Vicodin.

On January 7, 2011, Ms. Rust requested from Dr. Vyas an increase in her Vicodin dosage from two per day to four per day for her knee pain.

2. *Mental Health Issues*

On September 20, 2006, Ms. Rust presented to Dr. Vyas with headaches, anxiety, crying spells, and unprovoked anger. She was 20 years old, and her daughter was seventeen months old. Dr. Vyas diagnosed migraines, anxiety/depression, left knee joint pain, and weight gain. Dr. Vyas prescribed Lexapro and Xanax for anxiety. Ms. Rust visited Dr. Vyas on November 11 and December 20, 2006, to obtain refills for Xanax and a prescription for Topamax.

On April 11, 2007, Ms. Rust had no new complaints and continued on Xanax and Topamax. On October 4, 2007, Ms. Rust had her dosage of Topamax increased. For the next several visits, about every three months through January 16, 2009, Ms. Rust had no new complaints of anxiety or depression and continued to receive refills for her medications.

In April 2009, Ms. Rust's father went missing and was later found dead after a boating accident; on April 6, 2009, Ms. Rust requested medication for her "nerves" from Dr. Bhojraj and was prescribed Xanax. On April 10, 2009, Ms. Rust told Dr. Vyas that she was taking extra Xanax and that Cymbalta was not working. On July 8, 2009, Ms. Rust visited Dr. Vyas for a prescription refill and reported that she was taking Xanax, Vicodin, and Topamax. There is a question mark next to the word Cymbalta and a notation that Ms. Rust wanted to ask about medication.

Ms. Rust saw John Spores OP Therapist, Ph.D, HSPP, on November 1, 2010, with complaints of depression, anxiety, and alcohol abuse. Ms. Rust reported that she lived with her fiance and three children but that she felt "emotionally abandoned" by her mother and siblings since her father's death. He described Ms. Rust as cooperative and well-groomed with a depressed mood and appropriate affect. Ms. Rust's memory, orientation, cognition, attention span, and thought content were normal; she displayed logical, goal-directed thought process.

On November 3, 2010, Samir Gupta M.D. diagnosed Ms. Rust with major depressive disorder, single episode, moderate; chronic post traumatic stress disorder ("PTSD"); and alcohol abuse. He placed Ms. Rust on a trial of Pristiq, to replace Cymbalta, and also Abilify to take before bed. After a November 23, 2010 follow-up visit, Dr. Gupta again diagnosed Ms. Rust with major depressive disorder, single episode, moderate, and chronic PTSD. He replaced Abilify with Seroquel because Ms. Rust reported experiencing nightmares with Abilify. At the January 25, 2011 follow-up appointment, Ms. Rust reported a reasonable response to the medication with some residual symptoms of depression; she reported maintaining her sobriety and working on her current stressors; Dr. Gupta's assessment again was major depressive disorder, single episode, moderate and PTSD.

3.    *Migraine Headaches*

At the September 20, 2006 visit with Dr. Vyas, Ms. Rust complained of headaches, along with anxiety, crying spells, and becoming angry without any reason, all of which she reported she had experienced for the past five years. There are not any references to headaches in Dr. Bhojraj's treatment notes prior to that date. On October 19 and November 2, 2006, Ms. Rust underwent an EEG with Dr. Vyas; the results were normal for both tests. Dr. Vyas ordered a CT scan, which Ms. Rust underwent on December 16, 2006. The CT findings were within normal limits, and there were mild changes of ethmoid sinus disease.

On April 4, 2007, Dr. Vyas prescribed Topamax for migraine headaches. In July and October 2007, Ms. Rust complained of migraine headaches. For the next five years, she continued to take Topamax, get refills, and have her dosage increased once or twice.

On September 17, 2009, Ms Rust filled out a headache questionnaire. She indicated that the headaches began in August 2007; she was not sure what causes them; she gets them at the front of her head; light and noise bother her, and the headaches make her cry; she gets them everyday; she treats them with Topamax; they could last hours; she cannot get out of bed and gets aggravated; she had not been to the emergency room for headaches in the past 12 months.

During the consultative examination with Dr. Teofilo Bautista on December 11, 2009, Ms. Rust reported that her headaches are frontal in location and daily and that she had just started taking Topamax.

When she saw Dr. Spores on November 1, 2010, she reported suffering from severe migraines, among other things.

## C. Medical Source Opinions

*1.* *Physical*

a. Dr. Bautista - Consultative Examiner

On December 13, 2009, Dr. Bautista performed a consultative examination of Ms. Rust. On examination, Ms. Rust "refused" and was "unable" to do range of motion testing of her back and hips due to reported back pain. Dr. Bautista found knee pain in her left leg, with a flexion of 70 degrees, compared to no pain and flexion of 120 degrees in her right leg. He noted a limping gait due to left knee pain and an inability to do tandem, heel, and toe walking. He listed the strength in her left leg at 4 out of 5, compared to 5 out of 5 for her right leg. His impressions were chronic low back pain, chronic left knee pain, chondromalachia of the left knee with a small oblique tear of the medial meniscus (from the April 2006 MRI), and migraine headaches.

b. Dr. Whitley - Consultative Reviewer

B. Whitley, M.D. completed a Physical Residual Functional Capacity Assessment for Plaintiff on December 21, 2009. Dr. Whitley found that Ms. Rust could occasionally lift or carry up to 20 pounds, could frequently carry up to 10 pounds; could stand/walk or sit for about 6 hours in an 8-hour workday; and had unlimited ability to push and/or pull within the lifting restrictions. Dr. Whitley found Ms. Rust could frequently climb ramps or stairs, balance, and stoop and could occasionally kneel, crouch, crawl, and climb ladders, ropes, or scaffolds. Dr. Whitley noted that Ms. Rust's medical history established no manipulative, visual, communicative, or environmental limitations affecting ability to work. Dr. Whitley opined that Ms. Rust's reported severity of symptoms was partially credible but her alleged limitations exceeded objective findings. Dr. Whitley's findings were affirmed by J. Sands, M.D. on March 3, 2010.

c. Dr. Vyas - Treating Source

On February 9, 2011, Dr. Vyas completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) for Ms. Rust from 2006 to present. Dr. Vyas opined that Ms. Rust could sit or stand/walk for less than 30 minutes at a time and for less than 30 minutes total in an eight-hour workday; she could lift less than five pounds; she could never climb, balance, stoop, crouch, kneel, crawl, bend, or twist; she had a limited ability to reach, handle, and push/pull; and she should be limited from working around heights, machinery, extreme temperatures, chemicals, dust, noise, fumes, and humidity.

The medical findings Dr. Vyas lists to support the lifting restriction are: "Patient has low back pain with chronic lumbar radiculopathy. Therefore any lifting/carrying is very limited." (AR 477). The medical findings for the standing/walking restriction are: "Patient has gait disturbance

& chronic low back pain. Therefore patient's capability of standing & walking is very limited to prevent her for[sic] fall." *Id*. The medical findings to support the sitting restriction are: "low back pain & chronic lumbar radiculopathy; no sitting for long periods of time." (AR 478). The medical findings for the postural limitations are "gait disturbance" and "low back pain." *Id*. Finally, the medical findings for the physical functions affected is "pain" and for the environmental restrictions" is "constant pain & gait disturbance" and "risk for fall." *Id*.

Dr. Vyas opined that Ms. Rust needs 10- to 15-minute breaks to lie down more than twice in an 8-hour period "based on constant pain." (AR 479). Under the question, "other work-related activities which are affected by patient's condition," Dr. Vyas listed depression, anxiety, and nervousness. *Id*. Dr. Vyas stated that Ms. Rust has pain in her back every day and at times "feels depressed and anxiety[sic]." *Id*.

2. *Mental*

a. Dr. Snyder - Consultative Examiner

Ms. Rust underwent a consultative psychological evaluation with Todd Snyder, Psy.D. on November 7, 2009. Ms. Rust reported anxiety when leaving her home, panic attacks since the end of 2005, and depression and significant alcohol consumption since her father's death in April 2009. Ms. Rust presented in a dysthymic and downcast manner with poor social skills. She exhibited a depressed and flat affect but made appropriate eye contact and good effort during the examination. Dr. Snyder diagnosed Ms. Rust with panic disorder with partial agoraphobia; adjustment disorder with depressed mood; alcohol abuse; and a personality disorder not otherwise specified. Dr. Snyder's medical source statement was that Ms. Rust "appears to have pervasive pattern of anxiety

and aggressive response to feelings of panic. Her difficulty interacting with people appears to be related to anxiety and depression in addition to underlying personality disorder." (AR 395).

b.    Dr. Gange - Consultative Reviewer

J. Gange, Ph.D. completed a Psychiatric Review Technique form on November 12, 2009. Dr. Gange found the following categories of impairments from the Listings: affective disorder, disturbance of mood with adjustment disorder; anxiety-related disorder, panic disorder; personality disorder, NOS; substance addiction disorder, alcohol abuse. Dr. Gange found that Ms. Rust's impairments were not severe. Dr. Gange opined that Ms. Rust had no restrictions of activities of daily living, no episodes of decompensation, mild difficulties in social functioning, and mild difficulties in maintaining concentration, persistence, or pace. He noted that the evidence did not establish the presence of "C criteria." Dr. Gange stated that Ms. Rust had no history of psychiatric treatment other than a prescription from a general practitioner; she was coherent, cooperative, and friendly on the phone with the disability office; she cared for her children independently; she had physical limitations on her activities of daily living; minimal socialization; and she had no problems getting along with others.

Dr. Gange stated that Ms. Rust's mother reported that Ms. Rust interacts "fine" in public, is able to go out alone, attends well to conversations and television, has a generally good memory, and drinks a couple times a week but that she does not get drunk and drinking does not affect functioning. Dr. Gange stated that Ms. Rust's presentation to Dr. Snyder at the consultative examination was not consistent with reports from her or her mother and that the evaluation was not credible. Reports of Ms. Rust's activities of daily living did not support a finding of a severely

limiting mental impairment. Dr. Gange opined that Ms. Rust exaggerated her symptoms to Dr. Snyder. Dr. Gange's findings were affirmed by F. Kladder, Ph.D., on February 25, 2010.

c.      Dr. Gupta - Treating Source

On January 25, 2011, Dr. Gupta completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) for Ms. Rust. Dr. Gupta opined that Ms. Rust has an "Unlimited/Very Good" ability to make most occupational adjustments and to make most performance adjustments. However, he listed her as "poor/none" for dealing with work stresses, maintaining attention/concentration, and understanding, remembering, and carrying out complex job instructions. In the category of making personal-social adjustments, Dr. Gupta found that Ms. Rust has a "good" ability to maintain personal appearance, a "fair" ability to behave in an emotionally stable manner, and a "poor/none" ability to relate predictably in social situations. Dr. Gupta supported this assessment by noting that Ms. Rust had difficulties after her father's death and that she had been feeling very depressed and experienced crying episodes and poor sleep, which would interfere with her ability to "hold job at this time." (AR 475).

**D.  Testimony of Plaintiff Kimberly Rust**

Ms. Rust testified that she quit her job as a waitress at Denny's primarily because she suffered anxiety from being around so many people but also because of the back pain from standing. She stated that she would take three to four extra breaks per shift to rest or sit down. Ms. Rust testified that the main health problems that prevent her from working are anxiety and depression; other health problems are her back and knee pain after surgery.

Ms. Rust testified that she takes medication for anxiety and pain, the medications work, and there are no side-effects from the medications. She testified that her back constantly feels like it is

being "ripped apart." Her knee is swollen a lot, and she was told that the muscles are weak and that she should have surgery on her knee again because the kneecap is crooked. She testified that she can lift and carry 20 pounds, stand 20 minutes before needing to sit down, and sit for 20 to 25 minutes before needing to stand and stretch but that she cannot walk two blocks to her children's grandparent's home or the five blocks to the school bus stop.

Ms. Rust testified that anxiety causes her to be uncomfortable in enclosed spaces with strangers. She was uncomfortable in the hearing room because three strangers were present. She is not anxious with her three children. She does not mind being with her psychiatrist but does not like being with her therapist. She credited her psychiatrist and therapist with helping her stop abusing alcohol, testifying that she has not consumed alcohol since October 2010. Ms. Rust testified that she can drive but does not like to because she is scared and starts to have panic attacks; her mother or her boyfriend drive her to the store or doctor's appointments.

Ms. Rust testified that, on a normal day, she has trouble getting out of bed in the morning and she tries to relax and just lies around while she watches her children. She will sit and watch television as long as she can stand up every twenty minutes, but she can lie down to watch an entire movie. She testified that she lies down for six to seven waking hours of a day for a half hour to 45 minutes at a time.

Ms. Rust testified that she was getting migraines every day before receiving a prescription for medication to treat them, and she also testified that she was getting migraines 4 to 5 times per week before her medication. She was prescribed Topamax, and with the medication she has migraines approximately three times per week. She testified that she sometimes has very bad headaches that last up to an hour and a half and that make her vomit. When questioned by the ALJ,

she testified that she experiences these bad headaches three times per week but then shortly thereafter, when questioned by her attorney, she testified that she experiences these bad headaches one time per week. She clarified, through questioning by her attorney, that since she has been on Topamax, she has one bad headache per week. She testified that normal migraines last up to a half hour but that normal headaches do not affect her ability to do housework or attend doctor's appointments. She testified that she does things that are necessary and then the headache goes away. She testified that the Topamax has significantly helped.

### E. Testimony of Ms. Rust's Mother, Denise Brown

Ms. Rust's mother, Denise Brown, testified that she sees her daughter two days per week and she visits her daughter and grandchildren at Ms. Rust's home. Ms. Brown testified that she knew something was wrong with Ms. Rust around the age of 14 or 16 when she played softball for only one year because she was physically unable to play despite enjoying the game. Ms. Brown testified that Ms. Rust cannot get around well and cannot handle walking, sitting, or standing. Ms. Brown drives Ms. Rust to the doctor and the store, but they only go to the store together if someone else watches the children. Ms. Brown testified that she saw Ms. Rust have a panic attack a few months before the hearing and the attack occurred at home; Ms. Brown never witnessed Ms. Rust have a panic attack in the car, the store, or at the doctor's office. Ms. Brown testified that, if Ms. Rust gets up on the "wrong side of the bed," little things set her off all day. (AR 94). Ms. Rust will call Ms. Brown and yell at her when she has not done anything, and if the children are doing something they are not supposed to then Ms. Rust will become agitated. Ms. Brown testified that Ms. Rust's outbursts were unrelated to alcohol and that she had never blamed any outbursts on drinking.

## F.  Testimony of Vocational Expert, Grace Gianforte

Vocational Expert ("VE") Grace Gianforte testified at the hearing.  The VE reviewed Ms. Rust's past work history and heard all of the testimony at the hearing.  The ALJ asked the VE to indicate if her opinion was different from the definitions in the Dictionary of Occupational Titles ("DOT").  The VE identified the Chicago standard metropolitan statistical area as the region of the economy on which her testimony was based.  The ALJ asked the VE whether any jobs exist in the region that could be performed by an individual with Ms. Rust's vocational profile (age, education and work experience) and who was limited to light exertion work that required only occasional pushing or pulling with the left leg; only occasional climbing ladders, ropes, or scaffolds; only occasional kneeling, crouching, or crawling; and no more than occasional contact with supervisors, co-workers, and the public.  The VE stated that there were three occupations available in significant numbers in the regional economy:  solderer brazier, marking clerk, and bakery worker.

The ALJ next asked the VE to use the same hypothetical person and to add a sit/stand option. The VE responded that all three jobs were precluded because they were all performed while standing.  However, three other occupations were available with the sit/stand option: an assembler in electric and electronic products (1,500 jobs; DOT code 726.687-014), bench worker (900 jobs; DOT code 700.687-026), and polisher (900 jobs; DOT 713.687-034).

Next, the ALJ asked the VE to use the  hypothetical without the sit/stand option but with the requirement of only brief and superficial interaction with the public and co-workers.  The VE testified that such an individual could perform the first three jobs that she had presented; when the ALJ added a sit/stand option the VE testified that person could perform the assembler, bench worker, or polisher jobs.

The ALJ told Ms. Rust's attorney she was aware that, if Ms. Rust was unable to have even brief and superficial contact with others, or if she had to miss many days of work per week due to headaches, she would be precluded from working.

## G.  The ALJ's Decision

The ALJ received and considered three exhibits following the hearing:  Dr. Gupta's treatment records from Porter-Starke (12F), Dr. Gupta's mental medical assessment (13F), and Dr. Vyas' physical medical assessment (14 F).  On March 24, 2011, the ALJ issued her decision denying Ms. Rust's claims, finding that Ms. Rust was not disabled at step five.  Specifically, the ALJ found that jobs existed in significant numbers in the regional economy, based on the testimony of the VE at the hearing, because there were three occupations that fit the RFC with a sit/stand option with 3,300 jobs in the region: assembler (1,500 jobs), bench worker (900 jobs), and polisher (900 jobs). The ALJ found that the VE's testimony was consistent with the DOT.  The ALJ concluded that Ms. Rust was not disabled prior to February 26, 2008, for the purposes of CIB, and that Ms. Rust was not disabled for the purposes of SSI.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g) (2012).  Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting

*Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the

evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the

question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning

of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ

"uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v.

Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618

(7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*,

381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may

reverse the decision "without regard to the volume of evidence in support of the factual findings."

*White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th

Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the

reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the

important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55

F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must

"'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing

court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful

review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see*

*also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and h[er] conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2012). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically

considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC").  The RFC "is an administrative assessment of what work-related activities an individual can perform despite [her] limitations."  *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).  The RFC should be based on evidence in the record.  *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)).  The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ.  *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Ms. Rust presents four arguments for reversal and remand of the ALJ's decision.  First, Ms. Rust argues that the ALJ improperly discounted the opinions of treating sources and relied upon out-dated, non-examining opinions in her RFC assessment.  Second, Ms. Rust argues that the ALJ failed to include in either the RFC or the hypothetical question to the VE the frequency with which Ms. Rust would need to alternate between sitting and standing, as required by Social Security Administration Rulings.  Third, Ms. Rust contends that the ALJ committed an error of law when she found that migraine headaches were a severe impairment but then did not include any restrictions related to headaches in either the RFC or in the hypotheticals to the VE.  Finally, Ms. Rust contends

that the VE identified an occupation that is beyond her specific vocational preparation level. The Court considers each argument in turn.

## A. Residual Functional Capacity

*1.* *Weight of Medical Opinion Evidence*

Ms. Rust argues that the ALJ committed legal error by failing to give deference to the opinions of treating sources Drs. Gupta and Vyas. The Commissioner contends that the ALJ properly evaluated the opinions of these treating sources and reasonably found that they should be given less weight than the opinions of the non-examining State agency doctors.

The main distinction between a treating and a non-treating source is the length, frequency, and nature of the relationship. *See Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (stating that by definition a consulting examiner is non-treating source); 20 C.F.R. § 404.1502. A treating source has or has had an ongoing relationship with the claimant; a physician may provide treatment or a diagnosis and still be considered a non-treating source because of the lack of an ongoing relationship. *See id.* Upon examination of the record, Dr. Gupta had only seen Ms. Rust three times, and one of those visits included assistance with disability paperwork.[4] Nevertheless, notwithstanding the short length of treatment, the Court considers Dr. Gupta to be a treating source because Ms. Rust appears to have been seeing him for ongoing treatment. As for Dr. Vyas, the Court finds that she is a treating source; as of January 7, 2011, she had seen Ms. Rust regularly since 2006.[5]

---

[4] This date coincided with the date of Dr. Gupta's completion of the January 25, 2011 Medical Assessment of Ability to Do Work-Related Activities (Mental).

[5] Ms. Rust correctly notes that the Commissioner erred by asserting in the response brief that Dr. Vyas saw Ms. Rust only one time in 2006. Ms. Rust is also correct that the ALJ did not make this error in her decision.

When evidence in the record, including medical opinions, is inconsistent, the ALJ will weigh all relevant evidence. 20 C.F.R. § 404.1520b(b). When a treating source's opinion is well-supported by objective medical findings and not inconsistent with other evidence it is entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2). Generally, a treating source's opinion is given more weight than a non-treating source's opinion. *Id.* In deciding how much weight to give a doctor's opinion, the factors an ALJ considers are: the length, nature, and extent of the physician and claimant's treatment relationship; whether the physician supported his or her opinions with sufficient explanations; how consistent the opinion is with the record as a whole; whether the physician specializes in the medical conditions at issue; and other factors, such as the amount of understanding of the disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with other information in the claimant's case. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(6); *see also Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

If an ALJ discounts a treating source's opinion after considering the factors, a court must allow that decision to stand if the ALJ "minimally articulate[d]" her reasons, which is a deferential standard the Seventh Circuit has deemed "lax." *Elder*, 529 F.3d at 415 (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (citing *Rice v. Barnhart*, 384 F.3d 363, 372 (7th Cir. 2004))); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("An ALJ thus may discount a treating physician's medical opinion if it . . . 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as [s]he minimally articulates [her] reasons for crediting or rejecting evidence of disability.'" (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)). The Court is mindful that a review of a denial of

benefits is constrained to the rationale provided by the ALJ. *Scott*, 647 F.3d at 739 (citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).

As an initial matter, Ms. Rust contends that the ALJ's decision relies "too heavily on meaningless Agency boilerplate macros that lack specificity." Pl. Br., p. 11 (citing *Bjornson v. Apfel*, 671 F.3d 640, 645 (7th Cir. 2012)). Ms. Rust is correct that an ALJ cannot simply use boilerplate language without linking the conclusory statements to the evidence; however, the use of boilerplate language does not automatically dictate remand. *See Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013) (discussing boilerplate language in the context of a credibility determination) (citing *Shideler v. Astrue*, 688 F.3d 306, 311-12 (7th Cir. 2012); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008)). As discussed below, this is not a case in which the ALJ inserted boilerplate conclusions regarding the weight given to opinion evidence in lieu of analysis; the Court finds that the ALJ has met at least the minimal standard of articulating her reasoning.

As to the opinion of Dr. Gupta, the ALJ first dismissed Dr. Gupta's conclusion that Ms. Rust's mental issues affect her ability to "hold a job at this time," (AR 28) (citing Exhibit 13F), because the ultimate finding of disability is reserved for the Commissioner. The ALJ was correct to reach this conclusion; doctors and other treating sources are not entitled to deference on whether or not an individual is disabled. 20 C.F.R. § 404.1527(d)(3). The ALJ noted that Dr. Gupta indicated that Ms. Rust was poor in dealing with work stresses, maintaining attention and concentration, understanding, remembering and carrying out complex job instructions, and ability to relate predictably in social situations. The ALJ also noted Dr. Gupta's reliance on Ms. Rust's depression, crying episodes, and poor sleep in formulating his opinion. The ALJ gave "little weight" to the opinions of Dr. Gupta that are not reserved to the Commissioner because they are not well

supported by medically acceptable clinical and laboratory diagnostic techniques and they are not consistent with other substantial evidence in the claimant's case record, including the claimant's testimony at her hearing. (AR 28-29); *see* 20 C.F.R. §§ 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). Unlike the ALJ in *Roddy* who failed to explicitly address the treating doctor's opinion, the ALJ here summarized and evaluated the opinion of Dr. Gupta. *See Roddy*, 705 F.3d at 636.

Ms. Rust argues only that the ALJ did not provide a sufficiently detailed explanation for her conclusion to give Dr. Gupta's opinion "little weight;" notably, Ms. Rust does not argue that Dr. Gupta's opinion should have been given controlling weight. Ms. Rust does not point to any evidence in Dr. Gupta's treatment notes that support his assessment, and Ms. Rust has not identified any other objective evidence to support Dr. Gupta's assessment. Although Ms. Rust is correct that the ALJ did not articulate and analyze each of the factors to be considered when weighing opinion evidence, she does not identify any of the factors or argue how they should have been weighed differently. In fact, Ms. Rust does not discuss any facts regarding her mental impairment in this section of her brief; her specific arguments are limited to her physical impairments. A review of Dr. Gupta's few treatment records show that Ms. Rust was cooperative and well-groomed with an appropriate, albeit depressed, affect, and that her memory, orientation, cognition, attention, and thought content were normal. During her third visit with Dr. Gupta, Ms. Rust reported a reasonable response to medication with some residual depression and that she was maintaining sobriety.

The ALJ reasonably found that Dr. Gupta's opinion was inconsistent with the other evidence of record, given that the state agency reviewing psychologist reviewed the evidence following the consultative evaluation and determined that Ms. Rust did not even have a "severe" impairment. In

24

contrast, the ALJ found that Ms. Rust did suffer from a "severe" mental impairment and incorporated nonexertional limitations in the RFC, specifically that Ms. Rust should have no more than occasional contact with supervisors, coworkers, and the public. Ms. Rust does not contest this nonexertional limitation or argue that it does not properly account for her mental impairments. Thus, although the ALJ could have provided a more detailed analysis of the evidence and the factors, the Court finds that the ALJ minimally articulated her reasons for discounting Dr. Gupta's opinion.

Next, Plaintiff disputes the ALJ's articulation of the weight given to Dr. Vyas' opinion. The ALJ first summarized Dr. Vyas' opinion that Ms. Rust could only lift or carry less than 5 pounds due to her lower back pain, that she could only stand, walk, or sit less than one-half hour out of an 8-hour workday, and that she could never climb, balance, stoop, crouch, kneel, crawl, bend, or twist based on gait disturbance and low back pain. The ALJ also noted Dr. Vyas' opinion that Ms. Rust is limited in reaching, handling, and pushing and pulling because of constant pain, that Ms. Rust has restrictions in heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, and humidity, and that Ms. Rust would require more than two breaks in an 8-hour period. The ALJ found these opinions "extreme" and unsupported by the medical evidence of record, specifically Dr. Vyas' own office treatment records, and gave the opinion "little weight." (AR 29). As with the opinion of Dr. Gupta, the ALJ here summarized and evaluated the opinion of Dr. Vyas. *Compare Roddy*, 705 F.3d at 636. Again, Ms. Rust does not identify what factors should have been weighed differently in the ALJ's consideration of Dr. Vyas' opinion.

In her reasoning, the ALJ also noted that Ms. Rust testified that she could lift and carry at least 20 pounds and that her psychological problems were more severe than her back and knee

difficulties. In contrast, Dr. Vyas opined that Ms. Rust's ability to work was most restricted by her "pain" and "gait disturbance." Ms. Rust argues that her testimony that she could lift 20 pounds on a "single occasion" is not inconsistent with Dr. Vyas' opinion. (Pl. Br., p. 11). However, this is a mischaracterization of Ms. Rust's testimony. When asked how much she thinks she can lift and carry, she responded, "I would say probably 20 pounds," (AR 78); there was no qualification as to this being for a "single occasion." Ms. Rust also notes that "diagnostic testing has in fact confirmed that [Ms. Rust] suffers from chronic L5-S1 radiculopathy to the left lower extremity." (Pl. Br., p. 12).[6] However, there is no dispute that the ALJ acknowledged that Ms. Rust suffers from some pain and, in fact, included the result of the same diagnostic test in her review of Ms. Rust's medical history.

The consultative physical examination was essentially normal other than a limping gait without an assistive device and limited mobility in Ms. Rust's back and left knee. Moreover, the state agency reviewing physicians reviewed the record, including Dr. Vyas' examination notes and the results of the diagnostic testing and concluded that Ms. Rust could perform the full range of light work. Although the ALJ could have provided a more thorough analysis, her explanation for the weight given to Dr. Vyas' opinion was sufficient for the Court to follow her reasoning from the evidence to the conclusion.[7]

---

[6] Dr. Vyas' impression of the EMG testing was "suggestive of L5-S1 radiculopathy." (AR 456).

[7] Ms. Rust also appears to suggest that the ALJ improperly gave less weight to Dr. Snyder, the State agency psychological examiner. Pl. Br., p. 10 ("In this case, the ALJ rejected the opinion of the treating neurologist, the treating psychiatrist, and SSA's own consultative psychologist."). However, Ms. Rust offers no argument or analysis as to the weight given to Dr. Snyder's opinion, and her arguments regarding treating sources are inapplicable as Dr. Snyder is, by definition, a non-treating source. *See* 20 C.F.R. § 404.1502; *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009).

Ms. Rust's only argument against the weight given to the consultative reviewers is the comment that "the ALJ relied upon the opinions of non-examining State agency medical sources who offered their opinions long before the record was complete." (Pl. Br., p. 10). The opinions of the State agency doctors were a little over a year old at the time of the hearing and decision: State agency opinions were issued November 12, 2009, and February 25, 2010, for the psychological evaluation, and December 11, 2009, and March 3, 2010, for physical evaluation; the hearing was conducted on February 10, 2011; and the decision was issued on March 24, 2011. Ms. Rust cites *Jelinek* in support of the contention that relying on "out-dated" opinions of State agency doctors is a cause for remand. This reliance is misplaced; *Jelinek* dismissed the Commissioner's use of State agency opinions in defense of the ALJ's decision when the ALJ herself did not rely on the opinions in the decision. *Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011).[8] In this case, the ALJ relied upon the opinions of the State agency doctors and afforded them significant weight.

The facts of the two cases also differ. In *Jelinek*, the State agency opinions were over two years old at the time of the hearing; in this case, the opinions of the State agency doctors were, at most, a little over a year old at the time of the hearing. More importantly, Ms. Rust has not identified any evidence that was generated after these reviewers gave their opinions that in any way supports greater limitations than imposed or that would change the weight the ALJ should have given to the opinions. The later-occurring evidence was treatment notes from five visits to Dr. Vyas (only one of significance is a request for an increase in daily dosage of Vicodin from two to four on January 7, 2011), one visit to Porter-Starker (not with Dr. Gupta), three visits to Dr. Gupta, four

---

[8] In her reply brief, Plaintiff points out a citation in the Commissioner's brief that cited the prior version of the C.F.R. *See* Pl. Reply, p. 3 n.1. In a similar vein, the Court notes that, in her opening brief, Ms. Rust incorrectly cites *Jelinek* as contained in the F.2d reporter instead of the F.3d reporter. *See* Pl. Br., p. 10.

visits to Dr. Bhojraj (for ailments unrelated to the disability claim), and the medical assessments completed by Drs. Vyas and Gupta. The Court finds that the ALJ did not err in the weight afforded their opinions. 20 C.F.R. § 404.1527(e)(2)(ii).

Based on the foregoing, the ALJ did not err in the weight given to Ms. Rust's treating source opinions.

2.      *Sit-Stand Option*

Ms. Rust contends that the ALJ committed legal error by failing to follow SSRs 83-12 and 96-9p by not including in either the RFC assessment or in the hypothetical questions posed to the VE the frequency with which Ms. Rust would need to alternate between sitting and standing.

First, as to SSR 96-9p, Ms. Rust is correct that SSR 96-9p requires an ALJ to specify the frequency with which a claimant needs to alternate between sitting and standing under certain circumstances. SSR 96-9p, 1996 WL 374185, at *4 (July 2, 1996).[9] However, Ms. Rust's citation to SSR 96-9p is misplaced in this case because SSR 96-9p pertains to an RFC for less than a full range of sedentary work, and Ms. Rust's RFC is for a limited range of light work. *Id.*[10]; *see Taylor*

_____

[9] SSR 96-9p provides that, for an individual with an RFC for sedentary work who needs to alternate between sitting and standing, more often than just with lunch and regular breaks, cannot do the full-range of sedentary work and has an eroded occupational base. SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). In such an instance, "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." *Id.*

[10] SSR 96-9p is titled: "Policy Interpretation Ruling Titles II and XVI: Determining Capability to do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work." The purpose of SSR 96-p is "[t]o explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary work on an individual's ability to do other work," and particularly to emphasize that:
    1. An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare.
    2. However, a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled." If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.
SSR 96-9p, 1996 WL 374185, at *4 (July 2, 1996).

*v. Astrue,* No. 1:10-CV-1486, 2012 WL 1014837, at *10 (S.D. Ind. Mar. 23, 2012) (finding that SSR 96-9p did not apply in that case because it only applies to claimants with an RFC of less than the full range of sedentary work and the plaintiff had an RFC for less than the full range of light work).[11]

Ms. Rust also cites SSR 83-12 in support of this argument. The purpose of SSR 83-12 is "[t]o clarify policies applicable in using the numbered table rules in Appendix 2 of Subpart P of the regulations as a framework for adjudicating claims in which an individual has only exertional limitations, and no specific rule applies because the individual's . . . (RFC) does not coincide with any one of the defined exertional ranges of work." *See* SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983).[12] First, Ms. Rust does not have only exertional limitations; her RFC includes the nonexertional limitation of no more than occasional contact with supervisors, coworkers, and the public.

Second, even if SSR 83-12 is applicable, the ALJ complied with the requirement to consult with a VE regarding a sit/stand option. SSR 83-12 discusses the "special situation" of "alternate sitting and standing" when the "medical facts lead to an assessment of RFC which is compatible

---

[11] Cases in the Seventh Circuit that have required an ALJ to specify the frequency of alternating between sitting and standing have been for claimants with an RFC for sedentary work. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("[T]he ALJ did restrict Schmidt to work that allowed her an opportunity to sit or stand at her 'own option.'"); *Byerley v. Colvin*, No. 1:12-CV-91, 2013 WL 2145596, *16 (N.D. Ind. May 14, 2013) (finding that the ALJ's failure to describe specific intervals harmless because the ALJ described the claimant to the VE as requiring a sit-stand option "so work can be done both sitting and standing"); *Tenhove v. Colvin*, No. 12-C-627, 2013 WL 694829, at *15 (Feb. 26, 2013) (noting the erosion of the sedentary work base under SSR 96-9p when a claimant is limited to sitting no more than one hour without interruption); *Lopez v. Astrue*, No. 10-cv-8024, 2012 WL 1030481, at *10 ("A sit/stand option at will is frequently used in the Seventh Circuit, demonstrating that an 'at will' option is sufficient specification of frequency of the individual's need.") (citing *Zblewski v. Astrue*, 302 F. App'x 488, 492 (7th Cir. 2008); *Books v Chater*, 91 F.3d 972, 976 (7th Cir. 1996); *Schneeberg v. Astrue*, 669 F. Supp. 2d 946, 949 (W.D. Wis. 2009)); *Castrejon v. Apfel*, 131 F. Supp. 2d 1053, 1057 (E.D. Wis. 2001) ("[T]he ALJ's RFC finding regarding sitting/standing limitations is insufficient . . . . [The] RFC finding limited the plaintiff to sedentary work with a sit/stand option, but did not specify frequency, . . . . Furthermore, the hypothetical to the VE suffers the same defect.");

[12] SSR 83-12 is titled: "Titles II and XVI: Capability to do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work."

with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing." *Id.* The ruling provides that, "[i]n cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base." *Id.*

In this case, the ALJ found that Ms. Rust was limited to light work, with additional exertional limitations, including a "sit and stand option." (AR 24). At the hearing, the ALJ consulted the VE, who, in response to the first hypothetical *without* a sit/stand option, identified three available jobs, but, in response to the hypothetical *with* the sit/stand option, testified that those jobs were precluded because they were all performed while standing. The VE then testified that three other jobs matched the RFC and vocational profile *with* the sit/stand option. This is the hypothetical upon which the ALJ relied for her step five finding. *See Tjelle v. Astrue*, No. 11 C 4907, 2012 WL 1339637, at *8 (Apr. 18, 2012) (finding that a "limitation to light work" that included a "sit/stand option" properly accounted for the claimant's functional limitations, noting that other courts in the Seventh Circuit have found similar hypotheticals to satisfy SSR 96-6p) (citing *Betts v. Astrue*, NO. 09-7094, 2011 WL 1789822, at *15 (N.D. Ill. May 6, 2011) (sedentary work); *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008)).

Moreover, in this case, the VE heard testimony at the hearing directly addressing the frequency of Ms. Rust's need to alternate between sitting and standing. *See O'Connor-Spinner*, 627 F.3d at 619; *Simila*, 573 F.3d at 521. Ms. Rust testified that she needs to alternate sitting and standing every 20 to 25 minutes; thus, the Court may impute that the VE accounted for this frequency in the hypotheticals that included a sit/stand option. *See O'Connor-Spinner*, 627 F.3d at 619 ("We sometimes have assumed a VE's familiarity with a claimant's limitations, despite any

gaps in the hypothetical, when the record shows that the VE . . . heard testimony directly addressing those limitations.").[13]

Ms. Rust's attempt to conflate or read together SSRs 83-12 and 96-9p is unavailing. The ALJ did not err as to the sit/stand option in formulating the RFC or in posing the hypothetical to the VE.

*3.      Migraine Headaches*

Ms. Rust argues that the ALJ made several errors regarding her severe impairment of migraine headaches. First, Ms. Rust argues that the ALJ failed to account for her migraine headaches in the RFC and in the hypothetical posed to the VE by not providing for breaks or rest periods and not imposing any environmental restrictions. Ms. Rust offers no law in support of this argument. Unlike in *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004), the ALJ did not fail to discuss how Ms. Rust's headaches affect her ability to work in formulating the RFC. After discussing Ms. Rust's testimony regarding the frequency and severity of her headaches, the ALJ wrote:

> The claimant testified, if she takes her medication, that she would only get a severe headache once a week for a short period. Such infrequency of headaches and the short duration could be worked around to obtain full-time employment. Furthermore, the frequency and severity of the claimant's headaches are not documented in the treatment records.

(AR 25-26). The ALJ's description of the record regarding Ms. Rust's headaches is accurate, and Ms. Rust does not identify any records that demonstrate a greater severity. Because the ALJ

---

[13] This is not a case in which there was a series of increasingly restrictive hypotheticals. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010); *Simila*, 573 F.3d at 521 ("However, the exception does not apply if the record indicates that the VE's testimony was confined to the limitations set forth in the ALJ's hypothetical question." (citing *Young*, 362 F.3d 995, 1003 (7th Cir. 2004)). Rather, there were two sets of hypotheticals with an altered base-line relating to interactions with others, and the only additional restriction for the second question in each set was the sit/stand option.

adequately explained why no limitation for headaches was included in the RFC, it was not necessary for the ALJ to include a limitation in the hypothetical to the VE. *See Simila*, 573 F.3d at 521 ("[T]he ALJ is required only to incorporate into [her] hypotheticals those impairments and limitations that [she] accepts as credible." (quoting *Schmidt*, 496 F.3d at 846)).

Thus, the Court turns to Ms. Rust's argument that the ALJ mischaracterized her testimony as to the frequency and nature of her migraine headaches, which is essentially a challenge to the ALJ's credibility determination as to headaches. An ALJ's credibility determination is entitled to deference and will not be overturned unless it is "patently wrong." *Pepper*, 712 F.3d at 367 (quoting *Craft*, 539 F.3d at 678 (7th Cir. 2008)); *Simila*, 573 F.3d at 517; *Zurawski*, 245 F.3d at 887 (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)). An ALJ must consider the entire record and give reasons for the weight given to a claimant's statements; a failure to do so could be grounds for reversal. *Pepper*, 712 F.3d at 367 (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Bjornson*, 671 F.3d at 649).

The ALJ's credibility determination was not patently wrong in this case. The ALJ fully developed the record and considered all evidence relevant to Ms. Rust's testimony regarding her migraines. When the ALJ conducted her RFC assessment, she evaluated Ms. Rust's testimony, along with all the medical and opinion evidence. The ALJ only accepted as credible Ms. Rust's testimony regarding the effects of the migraines on her ability to function since she has been taking her medication. The ALJ recognized that Ms. Rust did not allege any side effects from the medications. The ALJ noted that treatment records from Dr. Vyas indicate that Ms. Rust complained of migraine headaches but that the frequency of the headaches was not documented, and she recognized that testing returned normal results. The EEG and CT scan by Dr. Vyas in 2006

were within normal limits. The Court also notes that the ALJ did not overlook any opinion evidence regarding the disabling effects of the headaches because the assessments from Drs. Gupta and Vyas do not contain any reference to headaches. Substantial evidence supports the ALJ's decision to not include limitations relating to migraine headaches in a hypothetical to the VE.

Finally, Ms. Rust argues that the ALJ improperly analyzed her migraine headaches when she found, with no input from the VE, that "such infrequency of headaches and the short duration could be worked around to obtain full-time employment." (Pl. Br., p. 14 (citing AR 26)). Ms. Rust contends that the use of the phrase "worked around" "smacks" of "reasonable accommodation." (Pl. Br., p. 14). Ms. Rust cites *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803 (1999), for the proposition that an SSA adjudicator is not entitled to consider potential accommodation by employers in determining the availability of jobs in the national economy that a claimant is able to perform. The cited portion of *Cleveland* explains that an SSA claim differs from an Americans with Disabilities Act ("ADA") claim because the ADA asks if the individual could work if they were provided reasonable accommodations whereas the SSA does not. *Id.* at 803.

The Court does not read the ALJ's decision as suggesting that an employer would provide a "reasonable accommodation" as that term is used in the ADA; there is no other reference in the decision to support this interpretation by Ms. Rust. Rather, the use by the ALJ of the words "worked around" means that Ms. Rust herself could work around her headaches; this interpretation is supported by Ms. Rust's testimony. At the hearing, Ms. Rust testified in response to several questions that the medication for her headaches was improving her condition, that usual headaches do not affect her ability to do housework or attend doctor's appointments, and that she does things that are necessary and then the headache goes away. (AR 78-84).

The Court finds that the ALJ did not err regarding the effect of Ms. Rust's severe migraine headaches on her RFC.

## B.  Step 5 - SVP 3 Listing

Ms. Rust argues that the ALJ erred by relying on the VE testimony that she can perform the job of assembler because she cannot perform semi-skilled work and the job of assembler is semi-skilled, reducing the number of unskilled jobs identified by the VE.  There are two issues for the Court's review, namely whether the ALJ improperly relied upon an occupation provided by the VE that exceeded Ms. Rust's skill level and, if so, whether the other two identified occupations existed in significant numbers in the economy to satisfy the Commissioner's burden at step five.

Because of her education level and lack of relevant prior work experience, Ms. Rust is limited to unskilled work under the SSA regulations.  *See* SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000); *see also* 20 C.F.R. § 404.1568(a) (definition of "unskilled work").  SSR 00-4p provides, "Skills are acquired in [past relevant work], and may also be learned in recent education that provides for direct entry into skilled work."  SSR 00-4p, 2000 WL 189704, at *3.  Unskilled work corresponds to an SVP of 1-2.  *Id.*  The SSR explains that the DOT lists an SVP for every described occupation and that the regulatory definitions of skill levels in 20 C.F.R. § 404.1568 are controlling.  *Id.*

Thus, the ALJ noted in the decision that, "[t]o determine the extent to which [Ms. Rust's] limitations erode the *unskilled* light occupational base," she had posed hypothetical questions to the VE.  (AR 30).  The ALJ then relied upon testimony by the VE responsive to those hypotheticals that Ms. Rust's vocational profile fit the description of three occupations: assembler (DOT 726.687-014), bench worker (DOT 700.687-026), and polisher (DOT 713.687-034).  However, Ms. Rust points out

that the assembler job is listed as SVP 3, which is a "semi-skilled" job under SSR 00-4p. In response, the Commissioner identifies several other "assembler" jobs that are classified as unskilled.[14] However, there is no evidence that these "assembler" jobs match the other requirements of Ms. Rust's vocational profile, specifically the sit/stand option. *See Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) ("[T]he DOT does not address the subject of sit/stand options . . . ."); SSR 83-12, 1983 WL 31253, at *4 ("In cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base."). Thus, the assembler job identified by the VE is beyond Ms. Rust's skill level and was improperly relied upon by the ALJ in concluding that jobs exist in significant numbers in the economy. *See Ferguson v. Astrue*, 541 F. Supp. 2d 1036, 1049 (E.D. Wis. 2008) (finding that jobs classified as SVP 3 or greater are not relevant for a plaintiff limited to unskilled work).

Accordingly, the Court must now determine whether the remaining two occupations identified by the VE, which are within Ms. Rust's skill level and vocational profile, exist in significant numbers to satisfy the Commissioner's burden at step five. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993); *Ferguson*, 541 F. Supp. 2d at 1050; 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c). The usual method for determining the number of jobs that exist in the national economy that match a claimant's vocational profile is to rely on a VE at the hearing. *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (citing *Lee*, 988 F.2d at 793). Jobs exist in the national economy when they exist in significant numbers in either the region the claimant lives or several other regions of the country. *Id.*; 20 C.F.R. § 404.1566(a).

---

[14] "However, Plaintiff ignores the fact that there are numerous assembly jobs in the [DOT] that are classified as unskilled." Def. Br., p. 10 n. 3 (citing http://www.occupationalinfo.org, Code Nos. 692.686-010, 692.685-274, 690.685-014, 754.685-014 (examples))."

In this case, the VE testified that the occupations of bench worker and polisher each had 900 jobs in the regional economy, for a total of 1,800 available jobs.[15] Therefore, the ALJ properly relied upon the VE's testimony regarding the other two occupations–bench worker and polisher. *See Coleman v. Astrue*, 269 F. App'x 596, 601-02 (7th Cir. 2008) (holding that the ALJ's failure to comply with SSR 00-4p as to one job was harmless because a significant number of jobs cited by the ALJ and not inconsistent with the DOT remained available).

Notably, Ms. Rust does not argue that 1,800 does not constitute a significant number of jobs. A review of cases in the Seventh Circuit reveals that 1,800 jobs is above the established threshold for a significant number of jobs. *See Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) ("[I]t appears well-established that 1,000 jobs constitutes a significant number." (quoting *Liskowitz*, 559 F.3d at 743)); *Lee*, 988 F.2d at 794 ("[P]laintiff's contention that 1,400 jobs is not a significant number unsupported by case law." (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 is a significant number of jobs); *Barker v. Sec'y of Health and Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs within significant number of jobs); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs significant); *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ill. 1990) (675 jobs a significant number), *aff'd*, 936 F.2d 575 (7th Cir. 1991))).

Based on the foregoing, the Court finds that the ALJ met the burden of proof at step five of the sequential analysis.

---

[15] Plaintiff incorrectly contends that the VE did not provide the ALJ with "the incidences of these two jobs in the national economy." (Pl. Br., p. 8 n. 2).

**CONCLUSION**

For the foregoing reasons, the Court finds that the decision of the ALJ is supported by substantial evidence and does not contain any errors of law. Therefore, the Court **DENIES** Plaintiff's Brief in Support of Complaint [DE 13] and **AFFIRMS** the ALJ's decision.

So ORDERED this 30th day of July, 2013.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record